1 | ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

2

3 | MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

4 | JARED S. BUSZIN (NYBN 5285838)
Assistant United States Attorney

5

6 | 450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7199

7 | FAX: (415) 436-7234
Jared.Buszin@usdoj.gov

8

Attorneys for United States of America

9

10 | UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

11

SAN JOSE DIVISION

12

13 | UNITED STATES OF AMERICA,                 )   CASE NO. 23-CR-353 PCP
                                            )
14 |        Plaintiff,                        )   UNITED STATES' OPPOSITION TO
                                            )   DEFENDANT BRINZAN'S MOTION FOR
15 |    v.                                    )   RELEASE
                                            )
16 | ██████████████████                      )
                                    and      )   Hearing Date: September 9, 2024
17 | ALEXANDRU BRINZAN,                       )   Hearing Time: 1:00 pm
          a/k/a "Brian Hansen,"              )   Court: Hon. Susan van Keulen
18 |      a/k/a "Albert Strany,"              )
                                            )
19 |        Defendants.                       )
                                            )

20

21 | **INTRODUCTION**

22 |        Defendant Alexandru Brinzan is a Romanian national and sophisticated criminal with no

23 | significant ties to this country, let alone the Northern District of California.  He has leveraged a number

24 | of aliases, supported by false identification documents, to evade law enforcement detection while

25 | conducting unlawful ATM card skimming in the United States for the past several years, resulting in the

26 | theft of more than $100,000 and likely much more.  Based on this conduct, a federal grand jury returned

27 | an indictment in October 2023 charging him with three offenses, including aggravated identity theft,

28 | which carries a two-year mandatory minimum sentence.  The defendant eluded detection for several

UNITED STATES' OPP. TO MOT. FOR RELEASE      1
23-CR-353 PCP

1  months, only to be arrested last month after he fled from local law enforcement in Southern California

2  when they found him and a co-conspirator conducting fraudulent ATM cashouts of public benefit

3  accounts.

4      After the defendant's arrest, he was transferred to federal custody and ordered detained by a

5  magistrate judge in the Central District of California, who concluded the defendant posed both a flight

6  risk and a danger to the community.  In connection with that detention hearing, the defendant's

7  purported ex-partner was identified as a willing surety, but the defendant was still ordered detained.

8      Now having made his first appearance in the Northern District of California, the defendant seeks

9  to reopen his detention hearing on the purported ground that his ex-partner is willing to co-sign a bond

10  and that this somehow constitutes new, material information justifying reopening the detention hearing.

11  It's not.  The Court should deny the defendant's request to reopen his detention hearing because he has

12  failed to put forward new, material information that was not available at the time he was originally

13  ordered detained and that would potentially warrant his release on bond.  In the alternative, the Court

14  should reaffirm the order that the defendant be detained pending trial because the record, as described in

15  greater detail below, plainly establishes that no conditions could mitigate the risk of flight and danger to

16  the community that the defendant poses.

17  **FACTUAL BACKGROUND**

18  **A.**     **The FBI Links the Defendant to a Los Angeles Residence Where Agents Recovered Substantial Evidence of Card-Skimming Activity**

19      In early May 2022, the FBI received information indicating that the defendant and others

20  involved in an organized ATM card-skimming group were operating in California.[1]  Agents were able to

21  identify a Los Angeles residence where the defendant and others were believed to be operating from,

22  and the defendant was observed at the residence during surveillance conducted on May 3, 2022.  Federal

23

24      [1] ATM card skimming generally involves the placement of an electronic device into the card slot

25  of an ATM, which captures electronic information from debit cards inserted into the ATM.  Skimmers will also install small cameras, commonly referred to as pinhole cameras, at ATM locations to capture

26  the PIN numbers associated with debit cards used at the ATM.  Once this information is collected, skimmers will create "clone cards" of the compromised debit cards using software and blank gift cards.

27  Skimmers will often affix stickers reflecting the associated PIN number to these clone cards, which allows the skimmer to use the clone card to withdraw funds (i.e., cashout) from the corresponding

28  account.  Card skimming in California is frequently perpetrated by sophisticated organized crime groups, many of which operate out of Romania.

1  agents obtained a search warrant, which was executed the next day.  Although the defendant was not at

2  the residence at the time, several other individuals were.

3         During their search of the residence, FBI agents recovered approximately $20,000 in U.S.

4  currency, more than 1,400 suspected cloned ATM cards, more than a dozen skimming devices, and

5  approximately 20 pinhole cameras.  Agents also searched a rental vehicle believed to be associated with

6  the defendant, which resulted in the seizure of about $1,000 in U.S. currency and a metal object believed

7  to be a skimming installation tool.

8         One or more of the individuals found at the Los Angeles residence were subsequently charged

9  with federal crimes in the Central District of California.

10     **B.     The FBI Arrests the Defendant at a San Jose Residence Where Agents Recovered
            Substantial Evidence of Card-Skimming Activity and False Identification**

11     **Documents Bearing the Defendant's Picture**

12        On or about May 10, 2022, the FBI received new information indicating the defendant was in the

13  San Jose area conducting further card-skimming activity.  Agents were able to track the defendant and

14  another suspect to two adjacent short-term rental units on Rancho Drive in San Jose.  They obtained a

15  federal search warrant for the units, which was executed on May 15, 2022.  After announcing their

16  presence and entering one of the units (161 Rancho), agents encountered one suspect inside and also

17  found the defendant in the vicinity of a walkway just outside the open window of a bedroom later

18  determined to be associated with him, suggesting the defendant had tried to flee out the window when

19  the FBI agents announced their presence.

20        Agents searched the defendant and recovered a fake Danish ID card with his photo bearing the

21  name "Brian Hansen," as well as a Visa gift card that was later determined to have been altered and

22  encoded with a Maestro debit card number:

23

24

25

26

27

28



A search of 161 Rancho resulted in the seizure of substantial evidence of card-skimming activity, including card skimmers, pinhole cameras, skimmer installation tools, numerous credit/debit/gift cards, more than $13,000 in U.S. currency, and a large number of cell phones and electronic devices. FBI agents also found numerous false identification documents, including a purported Danish passport bearing the defendant's picture and the "Brian Hansen" alias and a purported Slovakian passport bearing the defendant's picture and the name "Albert Strany."

 

When agents searched the second rental unit (163 Rancho), they encountered another Romanian national, multiple laptops, a card skimmer, gift cards, a sheet of stickers, and a paper with a list of four-digit PIN numbers written on it.

An analysis of one of the seized phones determined to be associated with the defendant led to the

1   identification of several noteworthy items, including (i) images of a suspected skimming device, camera

2   concealments, and skimmer installation tools; (ii) a biographic sheet indicating that the defendant had

3   used his "Albert Strany" alias to apply for unemployment benefits; and (iii) a video of pinhole camera

4   footage being viewed on a computer.

5          A further review of electronic devices found in the bedroom at 161 Rancho where the

6   defendant's identification documents were located resulted in the discovery of more than 4,500 debit

7   card numbers that were suspected to have been compromised.  Those card numbers were sent to the

8   associated bank for further analysis, which confirmed that many of those cards had been compromised

9   with a loss amount exceeding $100,000 for the six-month period preceding the date when the card

10  numbers were identified by law enforcement.  The evidence supporting this analysis included numerous

11  ATM still images showing the defendant and other co-conspirators conducting ATM cashouts using the

12  stolen card numbers.  Impacted victims included those who had funds stolen from their public benefits

13  accounts, resulting in significant hardship and life disruption.

14         The defendant was arrested and booked on state charges after the Rancho Drive units were

15  searched; however, state charges were not filed as federal authorities pursued their investigation.

16  Ultimately, the evidence recovered during the Rancho Drive search led to the defendant's federal

17  indictment in October 2023 on one count of conspiracy to commit bank fraud, one count of unlawfully

18  possessing fifteen or more unauthorized access devices, and one count of aggravated identity theft.

19         **C.     The Defendant and a Coconspirator Are Arrested in Southern California After
               Being Caught Conducting ATM Cashouts**

20         At approximately 6:30 a.m. on August 1, 2024, police in Brea, California were dispatched to a

21  Wells Fargo bank location based on a report that a large number of suspected fraudulent electronic

22  benefit transfer (EBT) transactions were being made at ATMs at the location.[2]  Officers found a single

23  vehicle at the ATM drive-thru at the bank, which was occupied by one suspect.  Officers conducted a

24  traffic stop of the vehicle and identified the occupant as Sandu Fumea, an apparent Romanian national.

25  Other officers arriving on scene observed the defendant running away from the bank on a nearby street

26

27  _____

28         [2] This fraudulent cashout activity typically is observed at the beginning of the month, soon after
    benefits are deposited into victim accounts.

1  as he dumped currency and fraudulent EBT cards onto the ground.  The defendant was detained and

2  searched, resulting in the seizure of ten fraudulent EBT cards, approximately $4,560 in U.S. currency,

3  and a Washington driver's license for an individual named "Alessandro Stilavato" which bore the

4  defendant's picture.



11  A search of the car Fumea was driving led to the recovery of more than $13,000 in U.S. currency and a

12  gift card with a magnetic stripe.  Officers also searched the area around the Wells Fargo ATM and found

13  24 gift cards, each bearing a sticker with a four-digit PIN number written on it.  After Brea police

14  learned of the existence of a federal warrant for the defendant's arrest, he was transferred to FBI custody

15  and brought to federal court in the Central District of California for his initial appearance and a

16  detention hearing in connection with the instant case.

### D.    The Defendant Is Ordered Detained Based on Risk of Flight and Danger to the Community

19  In advance of the defendant's detention hearing, Pretrial Services in the Central District of

20  California prepared a report for the Hon. Autumn D. Spaeth, who presided over the hearing.  In

21  preparing the report, Pretrial interviewed the defendant and attempted to verify his background with his

22  purported ex-partner, Luciana Burca, who he had been separated from for two years.  The report

23  disclosed that the defendant has been transient since 2021, living out of motels and short-term rentals

24  (like the 161 Rancho location), and unemployed for the past two years.  He declined to answer any

25  questions regarding his monthly living expenses, or any substance abuse.

26  Although he claimed that he would reside with a sister-in-law in Orange County if released,

27  neither the defendant nor Ms. Burca could identify her address.  The defendant also acknowledged that

28  he had close family living abroad.  The defendant identified a friend named "Dan" as a potential surety

UNITED STATES' OPP. TO MOT. FOR RELEASE    6
23-CR-353 PCP

and told Pretrial that Ms. Burca could provide his contact information; however, Ms. Burca told Pretrial she did not know who "Dan" was. Ms. Burca indicated that she herself was willing to serve as a surety, notwithstanding her lack of ties to the United States and her minimal income.

Pretrial ultimately recommended that the defendant be detained and Judge Spaeth agreed, finding the evidence established that no conditions could mitigate the flight risk and danger to the community that the defendant presented. *See United States v. Alexandru Brinzan*, No. 8:24-MJ-00333-Duty (C.D. Cal.), Dkt. 9. The defendant's "[l]ack of financially responsible sureties" was one of several considerations underlying Judge Spaeth's findings. *Id.*

**E.    The Defendant Presently Seeks Release on the Ground that Ms. Burca Is Willing to Serve as a Surety**

The government understands that Ms. Burca has been proposed as a surety and that this has been proffered as new information justifying a reopening of his detention hearing.

Review of a law enforcement financial database revealed that, in 2021 and 2022, Ms. Burca received $31,000 via sixteen money transfers sent by "Albert Strany," one of the defendant's aliases. The financial database also showed that the defendant's "Albert Strany" alias was used to send money abroad to other individuals sharing Ms. Burca's last name. A review of another database used by law enforcement further revealed that Ms. Burca lives in the same apartment complex as Sandu Fumea, the individual arrested with the defendant in Brea on August 1, 2024.

## LEGAL STANDARD

Under the Bail Reform Act of 1984, the Court must detain a defendant before trial without bail where "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; the government need not prove that both factors are present. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence, but a finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Id.* "[T]he Bail Reform Act mandates an individualized evaluation guided by the factors articulated in [18 U.S.C.] § 3142(g)." *United States v. Diaz-Hernandez*,

1    943 F.3d 1196, 1199 (9th Cir. 2019).  Categorical grants or denials of bail, not tethered to an

2    individualized determination, are impermissible.  *Id.*  Consideration of factors outside the articulated

3    factors set forth in Section 3142 is also disfavored.  *Id.*

4            Whether a defendant poses a danger to the community is not limited to considerations of

5    violence.  As the Ninth Circuit and other courts have acknowledged, it also encompasses financial

6    harms.  *See, e.g.*, *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least

7    in some cases, encompass pecuniary or economic harm."); *United States v. Giordano*, 370 F. Supp. 2d

8    1256, 1270 (S.D. Fla. 2005) ("There can be no question that an economic danger, like that posed by a

9    serial defrauder, falls under the broad umbrella of 'dangerousness' as that term is used throughout the

10   Bail Reform Act."); *United States v. Madoff*, 586 F. Supp. 2d 240, 253 & n.11 (S.D.N.Y. 2009)

11   (accepting that "in certain circumstances an economic or pecuniary harm may give rise to a

12   consideration of danger" for purposes of pretrial detention and noting that "[t]he question appears to

13   become one of propensity to commit further crimes, even if the resulting harm is solely economic").

14          In evaluating whether conditions of release can be fashioned that will reasonably assure the

15   appearance of the defendant as required and the safety of any other person and the community, the court

16   must consider four factors:

17       1.  The nature and circumstances of the offense charged;

18       2.  The weight of the evidence against the defendant;

19       3.  The history and characteristics of the defendant, including the defendant's character,
            physical and mental condition, family and community ties, past conduct, history
20          relating to drug or alcohol abuse, criminal history, and record concerning appearance
            at court proceedings, as well as whether the crime was committed while the defendant
21          was on probation or parole; and

22       4.  The nature and seriousness of the danger to any person or to the community that would
            be posed by the defendant's release.
23
     *See* 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).
24
            Under the Bail Reform Act, a detention hearing may be reopened "at any time before trial if the
25
     judicial officer finds that information exists that was not known to the movant at the time of the hearing
26
     and that has a material bearing on the issue whether there are conditions of release that will reasonably
27
     assure the appearance of such person as required and the safety of any other person and the community."
28

1   18 U.S.C. § 3142(f).

2   **ARGUMENT**

3   **I.     The Defendant Has Not Presented Material New Information Establishing a Basis for Release**

4

5       As an initial matter, the defendant has not come forward with new, material information that was

6   not known to him at the time of his original detention hearing and that would support his release.  As

7   noted in the initial Pretrial report from the Central District of California, Mr. Burca expressed a

8   willingness to serve as a surety from the outset.  Nevertheless, both Pretrial and Judge Spaeth concluded

9   that the defendant lacked financially responsible sureties—one of several considerations supporting his

10  detention.  This should end the matter.

11      Even if the Court were to reconsider Ms. Burca's viability as a surety anew, the evidence

12  suggests she would be a wholly inappropriate surety.  She lacks ties to the United States, has minimal

13  disclosed income, and was unable to answer a number of questions that the defendant directed Pretrial in

14  the Central District of California to verify with her.  More significantly, her prior receipt of significant

15  sums of money from the defendant through his "Albert Strany" alias, as well as her apparent connection

16  to the apartment complex where one of the defendant's co-conspirators resides, raises serious questions

17  as to whether she is involved in, or at the very least has had ongoing knowledge of, the defendant's

18  illegal activity.  It also raises serious concerns as to whether any money subject to possible forfeiture via

19  an unsecured bond would merely be criminal proceeds.[3]

    **II.    The Court Correctly Found the Defendant Was a Flight Risk and Presented a Danger to the Community**

20
21      Judge Spaeth's prior finding that the defendant should be detained as both a flight risk and

22  danger to the community is amply supported by the record regarding the defendant's background and

23  bail resources, the nature and circumstances of the charged offense, and the weight of the evidence, as

24  described above.

25      The record demonstrates the defendant is a professional fraudster who has supported himself,

26

27      [3] To the extent the defendant proposes to offer collateral to secure his release, the government
    requests that the Court set a hearing pursuant to 18 U.S.C. § 3142(g)(4) and *United States v. Nebbia*, 357
28  F.2d 303 (2d Cir. 1966), to inquire into the source of that collateral to ensure the defendant does not seek
    to use ill-gotten gains to secure his release.

1    and others, over the past several years through unlawful card-skimming activity as well as other

2    apparent fraudulent schemes.[4]  He has close family abroad, no stable ties to the Northern District of

3    California, and connections to myriad co-conspirators who could help him flee.  He is a sophisticated

4    criminal who has been able to leverage the use of numerous false aliases to evade law enforcement

5    detection and arrest.  And he has a significant incentive to flee here, where he faces a multi-year

6    advisory sentence under the Guidelines not even considering the two-year mandatory minimum sentence

7    that would follow a conviction on the aggravated identity theft charge.  Taking all of this into account, it

8    is readily apparent that if the defendant is released, he will simply assume a new false identity and

9    disappear into the ether.

10                                                    **CONCLUSION**

11          For the reasons stated above, the Court should not reopen the defendant's detention hearing and

12    he should remain in detention pending trial.

13

14

15    DATED:  September 8, 2024                                    Respectfully submitted,

16                                                                          ISMAIL J. RAMSEY
                                                                            United States Attorney
17

18                                                                          _____/S/_____
19                                                                          JARED S. BUSZIN
                                                                            Assistant United States Attorney
20

21

22

23

24

25

26

27

28          [4] As noted above, there are indications the defendant used his "Albert Strany" alias to
       fraudulently obtain unemployment benefits.

UNITED STATES' OPP. TO MOT. FOR RELEASE      10
23-CR-353 PCP